18-0-0-9-4 John Johnson v. City of Chicago Good morning, Your Honors. Councilman of the Police Department, Frank Kress, on behalf of the Apollo, John Johnson. We have a case here where there are two elements... The rules specifically say that you're supposed to have in your appendix a statement as the content of the Record on Appeal, and that every document is to be listed. You have an entry in your Table of Contents, the Record on Appeal, called Arbitration Exhibits with No Enumeration, and it covers 1,400 pages. You think that's complying with the rules? It's certainly not specific enough. Specific enough? It's certainly not specific enough. Well, I would say so. You know, you make us your clerks and require us to go through 1,400 pages of exhibits to find the exhibits that you rely on. Now, that's simply not the way this is supposed to work. We don't work for your law firms. You know, in the future, follow the rules. They're not advisory suggestions. Certainly. And, well, when I made arguments in my brief, they cited two specific pages. But you are absolutely correct that the voluminous page numbers, most of which are the vocational job search logs, certainly didn't have specific page numbers to the Record on Appeal. Additionally, there were issues with the completeness of the record from a certain court. We had to file a supplementary record, which I think made it difficult, as well, to write a brief in this manner. And that, ideally, by the time I filed my reply brief, was able to properly cite the supplemental record with regard to the treatment this gentleman had with Dr. Cole and Dr. Singh. Again, apologies with regard to the lack of specificity with regard to the records to the page of the exhibits. Once we get into them, though, we see what the issues are. And the issues here, there are two issues that are subject to the manifest way of the evidence. And my burden is to show you how the Commission's decision is not the accurate one, and the opposite conclusion is clearly apparent. The first, of course, is the causal connection to the claimant's lumbar spine injury. He was injured on July the 11th of 2012. Having a twisting injury of his left knee, which he says he struck his knee on while he was dwelling in a garbage truck. And his hand caught fire, and he had to put it out of course. Several months later, in fact about nine months later, after he had begun treatment with Dr. Brian Cole, he had developed low back pain. And Dr. Cole referred him over to his partner, Dr. Singh. Dr. Singh, on April 15th of 2013, noted that the claimant had begun experiencing increased lumbar back pain or spine pain. And specifically, in my opinion, opined that this was as a result of injury. And specifically noted that the claimant provides him a history of prior back pain for years. The arbitrator's decision that was modified by the Commission, essentially, in my opinion, was that we can't trust this claimant. And he didn't provide an accurate history to Dr. Singh of his prior conditions. I don't think that's true. I don't think the record reflects that at all. I think the gentleman was quite straightforward about the fact that he had prior back problems. Dr. Singh was writing his reports and sending them to Trident, which is a nurse that is an agent of the respondent. Telling them that there's this force-related low back injury that we need to treat. And he ultimately recommends a surgery, performs a lumbar surgery at the level of L4, L5. And then ultimately recommends an FCE and prescribes four restrictions pursuant to the FCE. And the gentleman ends up having light to medium work restrictions. Preventing him from returning to work is a last resort, which is a very intermediate job. Once he has the permanent restrictions, of course, we know that he enters into vocational rehabilitation in July of 2014. From July 9th, 2014 through August 5th of 2015, he works with Vocal Modem to attempt to find work within his restrictions. And he was unsuccessful in finding work, and he was unsuccessful with the program. He was discharged from the program in August of 2015, and the counselor at Vocal Modem opined that he was not compliant with all of their requirements for trying to find work. Nonetheless, upon discharge from the program, he continued on looking for work on his own. Counselor, you've gone through the facts in detail, and that's good. But one of the assignment of errors that you raise is that the commission is finding that there was no causal connection between the work accident of July 11, 2012 and his condition of ill-being is against the manifest word of the evidence. Why is that specifically, setting aside the whole history of the case? We've got, in absence of any competing medical evidence, there's no one to say that it's not. The only opinion, as I've stated in my brief, is that Dr. Sink saw this gentleman, recognized the brief. Can't the commission reject the only medical evidence before? It did. No, can it? It's entitled to. I'm going to piggyback onto this for my next argument with regard to vocational opinions, is that it should not be able to ignore if there's one medical opinion that's related to then negate that and find no causal connection. Well, they can't do it without a reason, and they had a reason. But there's no evidence in this record that he ever reported any form of back problems until nine months after July the 11th. And, by the way, during the arbitration hearing, he never even testified that he had pain in his back when this occurred. There was absolutely no testimony of that. Right. It was at several months that he started to experience increasing symptoms, and Dr. Cole heard about it. And there's also some evidence, isn't there, in the record, that he told one of his medical providers that he slipped and fell? He had taken a stumble and gasped. Yeah. He told Dr. Cole that two weeks ago. And the commission found that to be very relevant. Yeah. Again, Dr. Singh presumably knew this. Dr. Singh was told there was a pre-existing condition. We know that the work-related act needs to be just one factor to determine whether there's a causal relationship between the conditions. Well, didn't they indicate that Singh's opinion was flawed because it was based on, quote, a false history of back complaints immediately after the occurrence, close quote? A false? A false history of back complaints immediately after the occurrence. My reading of Dr. Singh's initial note from April 15, 2013, doesn't indicate that he provided any false information. He didn't listen to what I said to him. The commission indicated that Singh's opinion was based upon a, quote, false history of back complaints immediately after the occurrence. Your client never even testified that he had back complaints or pain immediately after the occurrence. The first time he ever reports it is nine months after the event. And the commission said, we don't buy Singh's opinion. There's too much evidence to suggest he had no back injury. Yes, that is their position. And I'm arguing here that it was an error and that he provided information to Dr. Singh that he had prior to the occurrence. When did he do that? When did he do that? I can't tell Dr. Singh he had prior problems. His initial evaluation was April 15 of 2013. Previously, I think it was many years ago, I don't see that as revolting. That's notwithstanding Dr. Singh. And that was April 15, 2013? Yes, Your Honor. And when was the date of the accident? Nine months prior, yes. That's the gap. That's what the commission has said. This is the problem with false information. Counsel, you also argued that the city has accepted the fact that the claimant's lumbar condition we've been talking about was related to the work accident of July 11, 2012. How did the city accept that? Based on what? Did the city pay for treatment? I know that's not by any cost. I was about to say, the answer is, you know, the case law is clear. The fact they voluntarily make payments is not an admission of liability. Yes. Okay. The fact that they paid the TTT thereafter, they paid benefits, I understand. It's information that informs you as to what their belief was with regard to the cause of the relationship. They do. That, of course, mattered to this job search. And, again, it was flawed. Petitioner was told I wouldn't know what he didn't do well. He didn't know what I needed to do about the job search. He did. He was able to file. However, I read the Gallon Act. And I read it. And it says, there's no affirmative requirement under Section 81 to claim and even conduct a job search. Rather, as discussed above, the claimant need only, excuse me, demonstrate an impairment or earnings. The claimant, through me, argues that there is clearly a demonstration of impairment or earnings that are based upon the expert reports of Oklahoma that indicated he could make $10,000 to $13,000 an hour. If he proposed more, as a blacksmith, he would have been making $44 an hour. At the time of trial, there's a union letter that reflects that. So that is a significant loss. That's how much he was, yeah, in his former job. But you're saying that only vocomotive. Is there any evidence to suggest that he, by any experts, that he could do better than minimum wage job? What does the report of J.F. Boyd Limited that's included within the vocomotive record say? I'm not aware of J.F. Boyd. Well, there's a report from J.F. Boyd that's contained within the vocomotive record that you filed as part of the record. And what does it say? It certainly indicates that he's capable of work other than minimum wage. So at the time of the hearing, minimum wage was below $10,000 an hour, which is what the opinion of vocomotive was. Well, J.F. Boyd is suggesting he has an aptitude for maintenance shop supervisor, building supervisor, fleet service coordinator, all positions that are in an industry very similar to what he was doing for the city. Sure. But then he goes through and he continues to apply for work before he can find any. And then by the time he's ready to close his vocational or by the time vocomotive is ready to close out his vocational assistants or their role, they again will find that the wages he could have earned are $10 to $13 an hour. They never varied from that. Counsel, did they ever – was their estimate, first of all, based upon any labor market survey? They did not formally – Did they take into consideration the claimants' education skills and qualifications? Was that specifically discussed? Well, we had meetings with them where he provided all that information to them, so – But in making their decision, did they cite that? Did they go into that? They did not. Okay. Well, that's what the – J.F. Boyd went into. He's got a welding certificate. He's certified through Local 1 of the Blacksmiths Boilermakers Union to perform all types of welding, the professional teaching certificate for welding. Commission looked at that and they go, hey, you know, $10 to $13, no. Well, I would, again, reiterate my argument that that finding, given the vocomotive report, given the vocomotive opinion, is against and counter to the amendment of the evidence and clearly the opposite. Conclusion that this man is under loss of earnings pursuant to Section 81 is the top result. Okay. Thank you. Thank you, Counsel. We have time to reply. Counsel may respond. May it please the Court, Counsel. Good morning, Your Honor. This is Christopher Jericho on behalf of the Apollo U.C. of Chicago. Your Honor, we ask that this Court affirm the well-supported decision of the Eleanor Wilkerson Compensation Commission because the Commission's decision is sustained by ample evidence on each of the issues raised on appeal before Your Honors today. As such, it cannot be said that an opposite conclusion is clearly apparent. I'd like to begin by addressing the issue of the maintenance benefits that Counsel raised. It's our position that the Commission's decision denying maintenance benefits is consistent with the record, not against manifestly of the evidence that should be affirmed. Maintenance requires that the claimant establish, first, an impairment in earnings, and second, that the claimant performed diligently in vocation renegotiation or performed a diligent job search. In this claim, neither of those elements is present. First, there's ample evidence in the record to support the Commission's decision that the claimant did not even suffer an impairment in earnings at all. In fact, Mr. Johnson was already working in permanent sedentary restrictions at the time of the July 11, 2012 accident, which was confirmed as recently as the fit-for-duty evaluation performed just a few months before in December of 2011. Mr. Johnson had been working in a sedentary capacity, in fact, since November, I believe it was November of 2006, resulting from a 2005 low back injury. So at the time that Mr. Johnson was injured, he was already working in a sedentary capacity. Well, wait a minute. What was he doing when he was injured? He testified that he was cutting metal fabric or cheap metal. He was cutting part of a garbage truck? Correct. You call that sedentary when he's doing it with a torch? How do you define sedentary? Let's try that. Sorry, Judge? How do you define sedentary? Finally, sedentary is typically a sitting down position where a claimant would be sitting. Is that what he was doing? Is that what he was doing for the sitting when he got hurt, when he hurt his knee? Well, we know it's not. The man's a blacksmith. He's cutting up garbage trucks with a torch. That's not sedentary. I don't care what his restrictions said. That's not what they had him doing. He was not doing sedentary work. I understand, Your Honor. However, he wasn't already on those restrictions. Even though he wasn't doing that at the time he was injured, that was the extent that he was supposed to be performing his job based on years worth of medical records. So where are we going with all this? It's essentially there's no medical opinion that says that he can't go back to the job that he was performing at the time he was injured in July of 2011. Sorry, July of 2012. So Dr. Cole releases the claim of sedentary restrictions, which is what he's already performing in July of 2012. Dr. Singh says that Mr. Johnson can go back to work lifting up to 10 pounds, which is even greater than what he was working at the time of the July of 2012. So, okay, so you're saying even though he was outside of his restrictions when he was injured, that he can't have any impairment of earnings because the restrictions out of locomotive or wherever they came from said he can only work with these restrictions? Is that what you're saying? I would essentially say, Your Honor, that it's the respondent's obligation or the act to give the claimant back to the position that they were at at the time of the injury. We're talking about impairment of earnings right now. Let's stick to that. Okay. How much was he getting paid when he was hurt? It was somewhere around $43 to $44. As what, a blacksmith? That's what he was classified as. Yes, and so he was being paid as a blacksmith. The city was paying him as a blacksmith. Correct. He was doing the work of a blacksmith. So if now he's injured and he can no longer do the work of a blacksmith, he may have an impairment of earnings, no? I don't believe so, Your Honor. And if I can direct you to page 209 of the record, which is the December 15, 2011 fitness for duty examination, he was already placed under sedentary restrictions and he was already classified as a blacksmith. It says right there on that fit for duty evaluation that he was employed by the state as a blacksmith. So while being able to be classified as a blacksmith, he was still under sedentary restrictions. Is there such a thing as a sedentary blacksmith? Yeah. Apparently there is. I mean, you think the city employs blacksmiths that sit in chairs? Sedentary blacksmiths? Only in Chicago. Your Honor, I was reading some notes in the record. You can't argue the bizarre. You know, it just doesn't work. Okay, well, Your Honor, furthermore, the claimant could not prove an impairment of earnings because he wasn't, well, I'll say that for my waste of time. Can I make a suggestion? I mean, the commission delineated some specific reasons why they found there was no impairment of earnings. Correct. You might want to concentrate on that. Certainly. Well, first and foremost, the commission found that there wasn't sufficient evidence to support that the claimant, the claimant did not put forth sufficient evidence as to what suitable employment he could have performed as a result of his. But didn't they also go into a discussion about his background, his education, his experiences, credentials? Correct. The cause of them say this 10 to 13 advances. Yes. Correct? Absolutely. So isn't that important? It sure is. Specifically, the commission found that there is history that Mr. Johnson had performed supervisor duties, he had certifications in welding. Additionally, he had experience in foreman. And the commission also found it particularly relevant that he was a small business owner, he owned rental properties. So to suggest that the max, his earning capacity was near 10 to $13 an hour, the commission did not find that persuasive. What does owning rental properties have to do with intellectual things? I think it shows, exactly, I think it shows he has a business mindset and that he's not, he has an entrepreneurial spirit and isn't certainly only capable of small jobs. I think the record is quite clear that the claimant did not prove an impairment in earnings. So we ask that you confirm the commission's decision with respect to the wage differential as well as the maintenance benefits. With respect to causation of the lumbar spine, I think Your Honor has a clear understanding of how the commission reached its decision. Granted, ideally there would have been a session 12 examination to provide Dr. Singh's comments. However, given the facts and the significant delay in any back treatment and lack of any testimony to support back blame, the commission certainly couldn't rely on each of those factors that Your Honor had already addressed earlier to support his decision with respect to causation of the lumbar spine. How do you construe the finding that Dr. Singh had a false history? Well, I reread Dr. Singh's note again this morning. In fact, I printed a copy of it out to bring with me today. And the thing that stands out to me the most is that Dr. Singh does identify that the claimant suffers from a prior herniated disc. However, on the second paragraph of page 30 of the supplemental record, he says, or Dr. Singh points out that the claimant is unsure of the exact details. Well, the claimant's been treated, or he's been on these restrictions for his low back for several years. In fact, about seven years before the date of this evaluation, and in fact, just in December of 2011, he was released within those same restrictions. So the claimant knows what his restrictions are. I think the fact that he was kind of withholding those from Dr. Singh is persuasive in this situation. So that's how I would address that, Your Honor. Furthermore, Dr. Singh, you know, he doesn't even address the fact that Dr. Cole said that in mid-December of 2012 that he took a stumble. Dr. Singh doesn't address the fact that there's a nine-month delay, any type of low back symptoms. So I think the commission was certainly within its purview to reject Dr. Singh's opinion and find that the claimant didn't suffer a lumbar injury. So those are your answers. Any other further questions? Let me just ask that you refer the commission's decision in its entirety. Thank you, Counsel. Counsel, you may reply. Counsel, I was just speaking briefly about the diligent job search and maintenance being paid along the way. And I think any reading of the locomotive reports will conclude that he wasn't doing what the locomotive wanted him to do. So I would suggest that, again, because the wage differential, in my opinion, is against the manifest way of the evidence, but then to award a wage differential pursuant to Section 81, that he be awarded Section 81 benefits as of the date of NMI rather than maintenance along the way while he was conducting the job search out of fairness for the way the job search was conducted. Thank you. Thank you, Counsel. Both pre-arguments in this matter will be taken under advisement and a written disposition shall issue.